**Opinion filed May 29, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00148-CR

_____

**NICHOLAS RAY LEYSE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 32nd District Court**
**Mitchell County, Texas**
**Trial Court Cause No. 8366**

### M E M O R A N D U M   O P I N I O N

Appellant, Nicholas Ray Leyse, was charged by a four-count indictment with causing the death of Chris Alan Nix. Counts One and Two charged him with murder. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(2), (b)(3) (West Supp. 2025). Count Three charged Appellant with manslaughter, and Count Four charged him with criminally negligent homicide. *See id*. §§ 19.04, 19.05 (West 2026). For purposes of

punishment enhancement, the State also alleged that Appellant was a habitual offender. *See id.* § 12.42(d). Appellant waived his right to a jury trial and entered an open plea of guilty to the offense of manslaughter and a plea of "true" to one of the enhancement paragraphs. The State abandoned Counts One, Two, and Four and the remaining enhancement paragraph.

At the conclusion of the punishment hearing, the trial court found Appellant guilty as charged in Count Three of the indictment and assessed his punishment at confinement for forty-six years in the Institutional Division of the Texas Department of Criminal Justice. In his sole issue on appeal, Appellant contends that the sentence is "manifestly unjust" because it is contrary to the mitigating evidence. We affirm.

*Background Facts*

At the outset of the punishment hearing, the trial court admonished Appellant that the sentencing range for his offense was confinement for not less than five years nor more than ninety-nine years or life. *See id.* § 12.32.

The State began by presenting evidence of Appellant's criminal history, which included convictions for the felony offense of possession or transport of a chemical with intent to deliver and the felony offense of unlawful possession of a firearm by a felon. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.124(d) (West Supp. 2025); PENAL § 46.04(e).

Officer Dan Brown testified for the State. Officer Brown was employed with the Mitchell County Sheriff's Office on the day of the shooting that resulted in Nix's death. He testified that he was first called "out to the lake," but was then diverted to the Mitchell County Hospital. When he arrived at the hospital, he saw a car parked under the awning to the emergency room entrance and someone lying in the car's backseat. The individual in the backseat was identified as Nix. At the time Officer Brown arrived, medical staff had ceased intervention because Nix was determined to be deceased.

2

Officer Brown observed a gunshot wound in Nix's chest. At the hospital, Officer Brown made contact with Appellant and Trevonda Emerson. The State entered into evidence Officer Brown's photos of the scene at the hospital and Officer Brown's bodycam footage. In the bodycam footage, Emerson can be heard explaining to Officer Brown that she and Nix were sitting on the bed in the camper when they heard shots. Emerson told Officer Brown that Appellant was yelling obscenities and alleging that Nix was being intimate with Appellant's wife.

Officer Brown reported that Appellant "appeared to be in a state of shock" when he saw him at the hospital. Appellant mentioned he was having a hard time breathing, but he declined medical treatment when it was offered. Officer Brown believed Appellant was angry "[t]o a degree" based on "certain colorful words that he used." Appellant told Officer Brown that he had a bad temper and that he was not trying to hurt Nix. On cross examination, Officer Brown reported that Appellant did not resist arrest and was cooperative throughout the investigation.

Officer Brown later interviewed Samantha Leyse, Appellant's wife. Officer Brown testified that Samantha understood that Appellant believed that she and Nix were in a relationship. Samantha denied that she had been intimate with Nix, and Officer Brown did not recall seeing texts that substantiated or confirmed any relationship between Samantha and Nix.

Samantha reported to Officer Brown that Nix had expressed feelings for her. She was concerned about Appellant finding out. She reported that he found out the morning of the shooting by "beating on her." Samantha reported to Officer Brown that, after Appellant found out, he "got the gun, went out there and shot [Nix]."

The State next called Phillip Vandergriff to testify. On the date of the shooting, Vandergriff was a Texas Ranger. Upon being called to assist in the investigation, he reported to the hospital and started collecting evidence. Afterwards, Ranger Vandergriff traveled to the scene of the shooting.

The State offered photographs of the scene of the shooting. Ranger Vandergriff testified about the photographs, including those depicting a blue Dodge pickup and a camper trailer. He testified that there was one gunshot toward the pickup, one gunshot that went through the window of the camper trailer, and then one gunshot at the door of the camper.

Ranger Vandergriff testified that he believed the "defect" in the Dodge pickup resulted from a shotgun, because of the nature of the pattern and defect. Ranger Vandergriff also identified two fired cartridge cases found in the front yard as .45 ACP cartridges. Ranger Vandergriff testified those cartridges went to the firearm photographed at the scene, a Springfield XD .45 handgun.

After scanning the scene, Ranger Vandergriff went with another Texas Ranger to the Mitchell County Sheriff's Office where they interviewed Appellant. The State entered the interview into evidence and published the exhibit for the trial court. Appellant maintained during the interview that he did not mean to "hit" Nix.

When the trial court inquired, Ranger Vandergriff testified that he believed the shotgun shot that hit the pickup occurred first. He believed that the shot that went through the camper window and the shot toward the camper door that ultimately hit Nix came next.

Appellant also testified. Appellant testified that he had been a client of West Texas Centers for Mental Health and Mental Retardation (MHMR) since 2011 or 2012. Appellant admitted that there had been "breaks in [his] treatment with MHMR" since then. When he was arrested for the instant charge, he requested MHMR evaluations from the jail and received treatment. He testified he was compelled to seek treatment because of depression and grief. Appellant reported that he was not sleeping well at the time because he had nightmares and was "dreaming about the incident." He "just kept replaying it over and over." He testified that there were "bouts of . . . crying all the time" and that he could not "talk

4

about much of anything." He testified that he was having conversations with Nix even though he knew Nix "was gone."

Appellant testified that MHMR had made diagnoses classifying him as bipolar with manic depression. He said "schizo-affective disorder bi-polar type" and "intermittent explosive disorder" were diagnoses familiar to him. At the time of trial, Appellant was on medicine for his diagnoses. He agreed that he was having difficulty becoming stabilized on his medicine and theorized that it was "probably because of . . . years of using drugs."

Appellant testified that Nix was "more than [his] friend, he was [his] brother." He met Nix through a neighbor and had known him for a little over two years. At the time of the shooting, Nix was living next door to Appellant's property. He had been living there for approximately three months, since the first part of January. Appellant testified that Nix moved there after having issues with the man he previously rented from because of an incident involving that man's girlfriend. Appellant reported that Nix would eat meals with him inside his home "all the time." However, he agreed that, at some point, his attitude toward Nix changed.

Appellant testified that the change in attitude began because of how Nix would react when Appellant arrived home at night. Appellant testified that Nix was in Appellant's home at hours that they had agreed Nix would not be in his home. Additionally, Appellant testified that there was an individual who had been "riding up and down the road" and accusing Nix of being a rapist.

Starting in January, Appellant had several conversations with Nix. At first, Appellant was "satisfied" with what Nix told him. Then, Appellant "receive[d] a warning from someone in law enforcement" telling him that he needed to keep Nix away from his property and his wife. Appellant talked to Nix about the warning he received and asked him to leave. Appellant testified that he did so because he did not think his wife was in a safe environment. He estimated that he asked Nix to

5

leave his property "[a]t least three" times. The night before the shooting, Appellant and Nix had an additional "brief exchange of words." Appellant testified that he did not fully remember their exchange because he was taking medication for kidney stones at that time. Nix drove Appellant to the ER earlier that same day.

Earlier that month, Appellant had learned from another woman that there might be something occurring between Samantha and Nix. Appellant was aware of the rape allegations against Nix and recalled law enforcement interviewing Nix about the allegations. When Appellant learned there might be something between Nix and Samantha, he felt "[l]ivid." He confronted Samantha about it at that time but did not feel that the matter was resolved after the conversation. He had another conversation with Nix at that time as well, telling him that he "thought it would be a good idea if he left and didn't come back around [Appellant's] property, [Appellant], or [Appellant's] wife."

On the morning of the shooting, Appellant had a discussion with Samantha about her relationship with Nix. Appellant testified that the conversation was calm and rational when it began, but it soon escalated because Appellant was not "satisfied with the answers [he] was getting." Earlier that week, Appellant had left to go to Lubbock. He had to return home unexpectedly because of an issue with his motorcycle. He testified that when he pulled into the driveway, Nix came out of Appellant's home "with his chest bowed out and a knife in his hand." Appellant testified that this did not "sit right with [him]."

The morning of the shooting, Samantha told Appellant that Nix confessed to falling in love with her. Appellant testified that everything was "so heated" in the moment after she told him that. He testified that he remembered "[t]unnel vision, ringing . . . like [he] was above [himself] looking down."

Appellant testified that he then grabbed the .45 that was in his house. He testified that he "wanted to make a stand" and scare Nix into believing "there [was]

no more talking about anything; it's time for [him] to go." Appellant reported that he did not know whether Nix or Emerson were in the camper because he had not been outside that morning.

Appellant testified that he first shot at the pickup using the shotgun. He remembered "dropping" the shotgun and, "while scanning [his] property," shooting toward the camper. He believed that the second shot resulted in the bullet hole through the window of the camper. He believed that the third shot was fired at about the same time Nix kicked the front door open on the camper, resulting in the wound that ultimately killed Nix. Appellant testified that he was not aiming the gun when he was firing.

Appellant testified that he did not see Nix standing in the door, and that he did not see Nix until Nix stepped back into view. He remembered Nix saying, "[Y]ou killed me, brother, you killed me." Appellant panicked and yelled at Emerson, asking if the car had keys in it. He then proceeded to put Nix into the car.

Appellant testified that he was trying to "sustain" Nix's life until they could reach the hospital. Appellant knew that Emerson had worked as a nurse, so he asked her to give Nix CPR while Appellant drove them to the hospital. About a mile to two miles from the property, Emerson asked Appellant to stop, and they switched places. Emerson drove the rest of the way to the hospital while Appellant attempted to give CPR to Nix.

Appellant expressed remorse because Nix "was [his] friend." Appellant testified he "had genuine care and concern for him [and] wanted him to be successful." Appellant shared that he and Nix had spent a lot of time together talking, and Appellant wanted Nix to turn away from "the lifestyle" of being a meth addict.

On cross-examination, Appellant admitted that both he and Nix used methamphetamine and were addicted to it. Appellant testified that he used

7

methamphetamine "[p]robably once a day" and that he and Nix used methamphetamine together. In the interview with the Texas Rangers, Appellant stated that he used methamphetamine the morning of the shooting.

Appellant could not explain why he shot the gun at the camper to scare Nix if he believed no one was there at the time. He testified that he "guess[ed]" he thought if Nix saw the bullet holes and the damage, "he would get the point and leave."

Appellant testified that he did not "beat [his] wife," but he admitted that he may have slapped her the morning of the shooting. When asked if that was "the only time [he'd] ever been physical" with his wife, he stated that there was one other time when he slapped her.

The State also questioned Appellant about his criminal history. Appellant admitted to multiple arrests and charges that occurred from 1997 to 2017. Appellant admitted that he was not allowed to have any firearms but was in possession of two when the incident occurred.

The defense called Heidi Selman, Appellant's younger sister, to testify. Selman testified that when they were both in high school, Appellant was protective and kept a "watchful eye" on her and her friends. In their adult lives, Appellant helped with projects around Selman's house. She explained that she could call and Appellant would be there to "get it done . . . whatever it [was]."

Selman testified about Christina Bolt, who Selman knew through Appellant. Selman testified that Bolt thought highly of Appellant because Appellant "helped her turn her life around." Bolt was unable to testify at trial but wrote a letter describing her respect for Appellant and the role Appellant played in her life. Selman read the letter into the record. Finally, Selman testified that Appellant meant a lot to their family and that she would like to see him out of prison to help take care of their parents one day.

The defense also called Sherry Nichols, Appellant's mother. She described Appellant's childhood and discussed Appellant's relationship with his two children. She testified that Appellant helped remodel her home and her parents' home before they moved in. Nichols believed that Appellant did not intend to kill Nix, and she stated that she would like Appellant to get out of prison in her lifetime.

The trial court heard closing statements from the State and the defense. The State recommended a sentence of over fifty years. Appellant's defense counsel suggested a sentence of confinement for ten years.

After closing statements, the trial court recounted the testimony that had been presented and expressed doubt that Appellant considered Nix a "brother" and that the shooting was accidental. The trial court acknowledged that Appellant "stepped forward and pled guilty," and stated it would "give [Appellant] credit for that, but not much."

*Analysis*

In his sole issue, Appellant asserts that the sentence is manifestly unjust because it is contrary to the mitigating evidence. Appellant acknowledges that the sentence is within the statutory range and does not assert that the sentence constitutes cruel or unusual punishment under either the United States Constitution or the Texas constitution. However, Appellant contends that there should be "some review" where the sentence is "contrary to the facts."

The trial judge is given a "great deal of discretion" in assessing the appropriate punishment. *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984); *see Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App. 2014). Courts assess the severity of a sentence "in light of the harm caused or threatened to the victim, the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses." *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016) (citing *Graham v. Florida*, 560 U.S. 48, 60 (2010)).

Generally, a trial court's decision regarding the appropriate sentence is a "normative process, not intrinsically factbound." *Ex parte Chavez*, 213 S.W.3d 320, 323 (Tex. Crim. App. 2006) (quoting *Sunbury v. State*, 88 S.W.3d 229, 233 (Tex. Crim. App. 2002)). "Subject only to a very limited, 'exceedingly rare,' and somewhat amorphous Eighth Amendment gross-disproportionality review, a punishment that falls within the legislatively prescribed range, and that is based upon the sentencer's informed normative judgment, is unassailable on appeal." *Id.* at 323–24 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003)); *see Simpson*, 488 S.W.3d at 323 ("[T]his Court has traditionally held that punishment assessed within the statutory limits, including punishment enhanced pursuant to a habitual-offender statute, is not excessive, cruel, or unusual.").

Appellant contends that the mitigation evidence is "overwhelming." Appellant points to evidence that he drove Nix to the hospital and attempted CPR, evidence that he had learned that a man he considered his "brother" had "attempted to steal his wife," evidence that he suffered from mental illness, evidence that he had nightmares and hallucinations "engendered by grief and remorse," and evidence that he had done "wonderful good works helping family and a friend in need" as mitigating evidence.

There is no support in the record for Appellant's implicit contention that the trial court refused to consider his mitigation evidence. *See Newman v. State*, No. 11-22-00076-CR, 2024 WL 847671 (Tex. App.—Eastland Feb. 29, 2024, no pet.) (mem. op., not designated for publication). The trial court received testimony from Appellant, Appellant's sister, and Appellant's mother. The trial court referenced Appellant's testimony about Nix being like his brother and drew a comparison to how Appellant treated Nix versus how he would treat his mother and sister. The trial court explained that it did not believe Appellant's testimony that his shooting of Nix was accidental, and it recounted the testimony that led it to that conclusion.

These references by the trial court indicate a consideration of Appellant's mitigation evidence.

Additionally, the trial court received testimony from law enforcement officials involved in the investigation and received evidence of Appellant's criminal history. The harm caused by Appellant's act of shooting Nix was great, and Appellant's criminal history was significant. *See Simpson*, 488 S.W.3d at 323. Accordingly, Appellant's sentence was not grossly disproportionate, and his mitigation evidence was not so overwhelming as to render his forty-six-year sentence unjust. We overrule Appellant's sole issue.

*This Court's Ruling*

We affirm the judgment of the trial court.

JOHN M. BAILEY
CHIEF JUSTICE

May 29, 2026

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.